**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN**

---

CHRISTINE T. CLEMINS, Individually
and on Behalf of All Others Similarly
Situated,

              Plaintiff,

  v.

ALLIANCE DATA SYSTEMS
CORPORATION, WORLD FINANCIAL
NETWORK NATIONAL BANK, and
DOES 1 through 100, inclusive,

              Defendants.

Case No. 11-CV-36-WEC


**PLAINTIFF'S MEMORANDUM OF
LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO
COMPEL ARBITRATION AND STAY
ALL PROCEEDINGS**


**<u>JURY TRIAL DEMANDED</u>**

---

Plaintiff Christine T. Clemins ("Plaintiff"), on behalf of herself and all others similarly situated (the "Class"), submits this memorandum in opposition to Defendants Alliance Data Systems Corporation ("Alliance Data") and World Financial Network National Bank's ("WFNNB") (collectively referred to as "Defendants") motion to compel individual, non-class arbitration and to stay all proceedings (the "Motion").

## I.     SUMMARY OF ARGUMENT

Plaintiff respectfully requests that the Court deny Defendants' Motion to Compel individual arbitration and enforce their class action waiver clause.  There is no valid, binding arbitration agreement between the parties, and even if there were an agreement to arbitrate, Defendants' arbitration provisions are unconscionable and unenforceable.

The Wisconsin Supreme Court and Court of Appeals have held clearly and repeatedly that arbitration and class action waiver provisions like those of Defendants' are void and unenforceable under generally applicable Wisconsin contract law.  *Wisconsin Auto Title Loans, Inc.*, 714 N.W.2d 155, 290 Wis. 2d 514 (2006); *Cottonwood Financial, LTD. v. Estes* ("*Estes*"), 784 N.W.2d 726, 325 Wis. 2d 749 (Ct. App. 2010); and *Coady v. Cross Country Bank, Inc.*, 729 N.W.2d 732, 299 Wis. 2d 420 (Ct. App. 2007).  Under Wisconsin law, it is clear that arbitration provisions and class action waiver clauses employed by sophisticated institutions with superior bargaining power exercising that power for the purpose of cheating, or potentially cheating, large numbers of consumers out of individual small sums of money and insulating themselves from their own illegal practices are unconscionable in their application, if not on their face.  *Id.*

Not only do Defendants impose the small-print contract on their customers on a take-it-or-leave-it basis, but the class action waiver has an exculpatory effect, shielding Defendants from liability when their unlawful conduct causes injuries too small to justify consumers' pursuit of

1

individual actions or arbitrations. These arbitration provisions are an attempt by Defendants to inoculate themselves from liability for their own willful scheme to defraud consumers. Though Wisconsin law applies to Plaintiff's unconscionability defense, the provisions in question should be struck whether Wisconsin or Ohio law applies.

## II.  FACTUAL BACKGROUND

### A.  Arbitration Provisions Were Not Provided To Plaintiff Prior To Or At The Time She Signed Up For The Retail Credit Card.

Plaintiff signed up for an Avenue Credit Card ("Credit Card") issued by WFNNB in 2005, while shopping at an Avenue retail store in Greendale, Wisconsin. (*See* Plaintiff Christine Clemins' Declaration In Support of Plaintiff's Opposition to Defendants' Motion to Compel Arbitration and Stay All Proceedings ("Clemins Decl.") ¶ 4.)  Plaintiff was approved for the Credit Card at the store and was able to use the credit card on the spot to pay for her purchases. (Clemins Decl. ¶ 6.)  Prior to signing up for and using the Credit Card, Plaintiff was not provided with written terms or conditions relating to her use of the Credit Card.  (Clemins Decl. ¶¶ 7-8.) Nor were any specific terms relating to her use of the Credit Card orally explained to her prior to her signing up for and using the Credit.  (Clemins Decl. ¶ 9.)  At no point prior to or during the signing process was Plaintiff made aware that her rights in relation to the Credit Card could be subject to binding individual arbitration.  (Clemins Decl. ¶¶ 4-9.)

### B.  Arbitration Provisions Were Not Provided To Plaintiff Prior To Or At The Time She Enrolled In The Payment Protection Plan.

Several weeks after Plaintiff signed up for and used the Credit Card, she received in the mail the physical Credit Card, a letter stating that she must activate the card, and a multiple page, single-spaced, small print pamphlet that she believes was the Credit Card agreement.  (Clemins

2

Decl. ¶¶ 10-11.)[1]  During the call to activate the Credit Card, the Defendants' automated phone system prompted Plaintiff to enroll in a Payment Protection plan.  (Clemins Decl. ¶ 12.)  In the automated message regarding Payment Protection, the plan was marketed to her as a service that would suspend or cancel her minimum monthly payment due on her Credit Card account and would excuse her from paying the monthly interest charge and the Payment Protection plan fee for a limited period of time in the event she became unemployed or disabled.  (Clemins Decl. ¶ 13.)

At no time during the activation call was Plaintiff informed about the numerous and complicated limitations, exclusions and restrictions that would bar her from receiving any benefits from the Payment Protection plan, even if she diligently paid the monthly fees required for the service.  (*Id.*)  At no time during the activation call did Defendants' representative or automated system inquire if Plaintiff was currently unemployed or disabled and thus ineligible for Payment Protection plan benefits.  (Clemins Decl. ¶14.)  At all times, from the submission of her Credit Card application through and including the present, Plaintiff was unemployed and receiving disability benefits.  (Clemins Decl. ¶ 21.)  Further, at no time during the activation call was Plaintiff informed that the terms and conditions applying to enrollment in the Payment Protection plan were controlled by any terms and conditions in the Credit Card Agreement.  (Clemins Decl. ¶ 15.)  Defendants' automated phone system did not explain, state, or mention

---

[1]      Plaintiff's phone call activating the physical Credit Card is not the moment when she "signed up for" or agreed to be bound by the terms of Credit Card Agreement, as described in section 2 of the agreement.  Plaintiff "signed up for" and used the Credit Card on the day she filled out the credit card approval form at the Avenue store, and thus this is the relevant time period to consider when and if Plaintiff contractually agreed to be bound by the arbitration provisions, or if such arbitration provisions are valid.  The place of contracting is the place of occurrence of the last act necessary to give the contract binding effect.  *See Paulson v. Shapiro*, 490 F.2d 1, 7 (7th Cir. 1973) (applying Wisconsin law); *Continental Ins. Co. v. Garrison*, 54 F. Supp. 2d 874, 880-81 (E.D. Wis. 1999).  Plaintiff's use of the Credit Card, in Wisconsin, on the day she was approved was the necessary "last occurrence."

3

that any possible future claims Plaintiff may have relating to the Payment Protection plan would be subject to binding individual arbitration. (Clemins Decl. ¶ 16.) To her knowledge, Plaintiff has never received any written terms or any agreement of any kind, specifically for the Payment Protection plan. (Clemins Decl. ¶ 17.)

At no point prior to agreeing to enroll in the Payment Protection plan did Plaintiff agree to submit any potential future claims she might have to arbitration and Plaintiff has no recollection of giving up her right to go to court. (Clemins Decl. ¶¶ 18-20.) The term arbitration was never mentioned. (Clemins Decl. ¶¶ 4-20.) Further, Plaintiff's individual damages are too small for her to justify the effort and expense of individual litigation or arbitration. (Clemins Decl. ¶¶ 22-25.) Thus, prior to and during the sign-up process at the Avenue store and the enrollment process for the Payment Protection plan, Plaintiff did not agree to any arbitration provision, nor was she aware that she might be consenting to a loss of significant legal rights by agreeing to individual arbitration of any potential future claims. (Clemins Decl. ¶¶ 4-20.)

## III.   LEGAL ARGUMENT

### A.   Defendants Have Failed To Meet Their Burden That A Valid Arbitration Agreement Exists.

As a threshold matter, Defendants have failed to meet their burden of showing that Plaintiff agreed to resolve any and all of her claims relating to her Credit Card account and the Payment Protection plan through binding individual arbitration. Absent such a showing, this Court need not proceed any further.

The first principle of arbitration is that "a party cannot be required to submit to arbitration any dispute which [s]he has not agreed to submit." *Int'l. Med. Group, Inc. v. Am. Arbitration Ass'n*, 312 F.3d 833, 842 (7th Cir. 2002) (the party seeking to compel arbitration bears the

4

burden of proving the existence and validity of an agreement to arbitrate). Thus, "[b]y its terms," the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.,* "does not apply until the arbitration clause in question is determined to be part of the contract. [The FAA] dictates the effect of a contractually agreed-upon arbitration provision, but it does not displace state law on the general principles governing formation of the contract itself." *Chan v. Drexel Burnham Lambert*, 178 Cal. App. 3d 632, 640 (Cal. Ct. App. 1986) (quoting *Supak & Sons Mfg. Co., Inc. v. Pervel Indus., Inc*. 593 F.2d 135, 137 (4th Cir. 1979)).

The Court's initial role in the arbitration motion process is to determine "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys.*, 207 F.3d 1126, 1130 (9th Cir. 2000). In determining a motion to compel arbitration courts are to apply "a summary judgment standard [of review] as set forth in Federal Rules of Civil Procedure 56(c)…and [t]he court must consider all of the non-moving party's evidence and construe all reasonable inferences in the light most favorable to the non-moving party." *Tickanen v. Harris & Harris, Ltd.*, 461 F. Supp. 2d 863, 866 (E.D. Wis. 2006) (citing *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 n.9 (3d Cir 1980); *see also Three Valleys Mun. Water Dist. v. E.F. Hutton & Co., Inc*., 925 F.2d 1136, 1141 (9th Cir. 1991) (quoting same).

The FAA reflects a federal policy favoring the enforcement of valid arbitration agreements. *Gilmer v. Interstate/Johnson Lane Corp*., 500 U.S. 20, 24 (1991). This presumption, however, does not apply to the determination of whether there is a valid agreement to arbitrate between the parties; instead "ordinary contract principles determine who is bound." *Comer v. Micor, Inc*., 436 F.3d 1098, 1004 n.11 (9th Cir. 2006) (quoting *Fleetwood Enters., Inc. v. Gaskamp*, 280 F.3d 1069, 1073 (5th Cir. 2002) and *Daisy Mfg. Co. v. NCR Corp*., 29 F.3d

5

389, 392 (8th Cir. 1994)).  The FAA creates "a body of federal substantive law of arbitrability, applicable to any arbitration agreement within coverage of the Act."  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp*., 460 U.S. 1, 24 (1983).  This body of federal law also requires courts to apply state law, "[i]f that law arose to govern issues concerning the validity, revocability and enforceability of contracts generally."  *Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987); *Wisconsin Auto Title Loans*, 714 N.W.2d at 176-77 n.65-66.

Under both state contract and federal common law principles,

> [t]he law is well settled that in order for a contract to come into being, there must be a "meeting of minds" of the parties to the contract…[and] [o]ne of the essential elements for the formation of a contract is a manifestation of assent by the parties to the terms thereof. It is essential that both parties assent to the same thing in the same sense and that their minds meet on the essential terms and conditions.

*Interstate Indus., Inc. v. Barclay Indus., Inc.*, 540 F.2d 868, 870-71 (7th Cir. 1976).  "While the Supreme Court has stressed in recent years that federal policy under the FAA favors the enforcement of valid arbitration agreements, the Court has been equally adamant that a party can be forced into arbitration only if she has in fact entered into a valid, enforceable contract [or contract provision] waiving her right to a judicial forum."  *Penn v. Ryan's Family Steak Houses*, 269 F.3d 753, 758 (7th Cir. 2001).

Defendants have failed to carry their burden of proof that Plaintiff was ever presented with, or given a meaningful opportunity to review, negotiate or agree to, the arbitration provisions relating to the Credit Card agreement and the Payment Protection plan prior to signing up for and using her Credit Card.  Indeed, Plaintiff was approved for the Credit Card at the Avenue store and was able to use the credit card on the spot to pay for her purchases.  (Clemins Decl. ¶ 6.).  She did not receive the Credit Card Agreement until several weeks later and never

6

received an agreement specifically for the Payment Protection plan. (Clemins Decl. ¶¶ 10-11, 17.).

Defendants have not produced any evidence Plaintiff actually received or saw the Card Agreement before she enrolled in their Payment Protection Plan or before the company moved to compel her arbitration. Ms. Dent's Declaration does not indicate that she has personal knowledge of sending the Card Agreement to Plaintiff and fails to set out in detail the procedures Defendants uses to ensure customers receive it.[2] Given that Plaintiff was never presented with or even aware of these arbitration provisions, which significantly affect and constrict her legal rights, Defendants cannot prove that a contractually valid "meeting of the minds" occurred. Therefore, no valid arbitration agreement exists between the parties and Defendants' Motion should be denied.

**B.**      <u>**WFNNB's Arbitration Provisions Are Unconscionable And Unenforceable.**</u>

The United States Supreme Court has recognized that the FAA does not preempt the unconscionability defense to enforcement of a contractual arbitration provision. Under Section 2 of the FAA, a court may decline to enforce an arbitration agreement based upon "generally applicable contract defenses, such as fraud, duress or unconscionability." *Doctor's Assocs., Inc. v. Casarotta*, 517 U.S. 681, 686-87 (1996) (citing 9 U.S.C. §2); *see also Wisconsin Auto Title Loans*, 714 N.W.2d at 176-77 n.65-66. The FAA thus sanctions the practice of invalidating arbitration provisions that are found by a court to be oppressive or unconscionable. The body of federal law the FAA creates requires that federal courts apply state law, "whether of legislative

---

[2]     As a result, Ms. Dent's declaration does not comport with Fed. R. Civ. P. 56(e)(1), and the Court should not consider the Dent Declaration for proof of the truth of the matters asserted therein. If the Court decides to grant any consideration to Ms. Dent's inadequate declaration, Plaintiff requests the opportunity to depose her.

7

or judicial origin [ ] if that law arose to govern issues concerning the validity, revocability and enforceability of contracts generally." *Perry*, 482 U.S. at 493 fn.9 (1987); *see also Wisconsin Auto Title Loans*, 714 N.W.2d at 176-77 n.65-66. The applicable state law in this matter is Wisconsin. Defendants' Motion states in a footnote that, due to the choice of law provision in the Credit Card Agreement, Ohio law should apply. Notwithstanding the choice of law provision in the Credit Card Agreement, Wisconsin law applies here. Defendants have failed to meet their burden that the law of Wisconsin, the forum state, does not apply.

### 1. Wisconsin law governs this case.

"The 'first rule' in [Wisconsin]…choice-of-law analysis…[ is] that the law of the forum should presumptively apply unless it becomes clear that nonforum contacts are of the greater significance." *Jafari v. Wynn Las Vegas, LLC*, 569 F.3d 644, 649 (7th Cir. 2009) (quoting *Drinkwater v. Am. Family Mut. Ins. Co*., 714 N.W.2d 568, 575-76, 290 Wis. 2d 642 (2006) and *State Farm Mut. Auto. Ins. Co. v. Gillette* ("*Gillette*"), 641 N.W.2d 662, 676, 251 Wis. 2d 561 (2002)).

Notwithstanding Defendants' brief footnote reference to the "Governing Law" section of the Credit Card Agreement, under Wisconsin law parties are not free to contract for a choice of law "at the expense of important public policies of a state whose law would be applicable if the parties['] choice of law provision were disregarded." *Coady*, 729 N.W.2d at 737 (*quoting Bush v. Nat.l Sch. Studios, Inc*., 407 N.W.2d 883, 886, 139 Wis. 2d 635, (1987)). "Among the laws 'likely to embody an important state public policy' are those that 'are designed to protect a weaker party against the unfair exercise of superior bargaining power by another party." *Coady*, 729 N.W.2d at 737 (quoting *Bush,* 407 N.W.2d at 887). In *Bush* the court disregarded a choice-of-law clause specifying the application of Minnesota law in order to protect the important public

8

policy embodied in the Wisconsin Fair Dealership Law. 407 N.W.2d at 887-88. In *Coady* the court made the same decision on a Delaware choice-of-law provision in order to give effect to the important public policy considerations underpinning the Wisconsin Consumer Act. 729 N.W.2d at 737-38. Both of these decisions were based primarily on the fact that the underlying laws are designed to protect weaker individual parties against the unfair exercise of vastly superior bargaining power by another party. *Id.*

Here, Plaintiff has alleged violations of Wisconsin's Fraudulent Representations and Deceptive Trade Practices Act ("WDTPA"), § 100.18, Wis. Stats., "the general purpose of …[which] is to prevent certain activities deemed harmful to citizens' economic and social well-being." *Tim Torres Enter., Inc. v. Linscott*, 416 N.W.2d 670, 676, 142 Wis. 2d 56, 72 (Ct. App. 1987). *See also Novell v. Migliaccio*, 749 N.W.2d 544, 551, 309 Wis. 2d 132 (2008) (quoting *State v. Automatic Merchandisers of Am., Inc.*, 221 N.W.2d 683, 686, 64 Wis. 2d 659 (1974)) (§ 100.18, Wis. Stats. is "intended to protect the residents of Wisconsin from any untrue, deceptive or misleading representations made to promote the sale of a product."). Accordingly, as was the case in *Bush* and *Coady*, Defendants' choice of law clause should be disregarded, and Wisconsin law should apply.

Under Wisconsin law, "when performing a choice of law analysis, courts first presume that the law of the forum applies unless it 'becomes clear that nonforum contacts are of the greater significance.'" *Coady*, 729 N.W.2d at 738 (quoting *Gillette*, 641 N.W.2d at 676 (citation omitted)); *see also Drinkwater*, 714 N.W.2d at 575-76. If it does "become…clear that nonforum contacts are of greater significance, then the court will apply five 'choice-influencing'" factors. *See Drinkwater*, 714 N.W.2d at 576; and *Gillette*, 641 N.W.2d at 676. The five "choice-influencing" factors are: (1) predictability of results; (2) maintenance of interstate and

9

international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interests; and (5) application of the better rule of law. *Id.*

### a. Ohio does not have contacts with matters of this lawsuit that are of greater significance than those of Wisconsin's.

Here, applying Ohio law would violate "[t]he 'first rule' in the choice-of-law analysis", as there is no evidence or reasoning that would justify overcoming the presumption that the law of the forum (Wisconsin), should apply. *Cf. Drinkwater*, 714 N.W.2d at 575-76; and *Gillette*, 641 N.W.2d at 676. The place of contracting was Wisconsin. Plaintiff, a Wisconsin resident, signed up for, was approved for, and received the credit card in Wisconsin. Plaintiff used the card in Wisconsin and made payments from her Wisconsin bank account.

In contrast, Defendant WFNNB's headquarters were previously located in Ohio, but have now moved to Delaware. In 2010 Alliance Data moved WFNNB's headquarters from Ohio to Delaware, joining "a sizable number of other national banks" there because of that state's "more favorable business environment for bank operations." (*See* August 10, 2010, "News Release" issued by Alliance Data, a copy of which is attached as Exhibit A to the Declaration of Corey Mather submitted in Support of Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Compel Arbitration and Stay All Proceedings ("Mather Decl.").) Defendant Alliance Data, WFNNB's parent corporation has, and has had at all relevant times, its headquarters located in Texas. (*See* "Contact" information page from Alliance Data's website, a copy of which is attached as Mather Decl., Exhibit B.) Thus Defendants cannot demonstrate a substantial relationship to Ohio.

Defendants' only real potential claim for the significance of Ohio law would be—like the bank defendant's argument in *Coady*—based on "faulty logic." 729 N.W.2d at 738. Neither

10

Defendant is a Ohio corporation or bank, and as of the filing of this lawsuit, neither Defendant was headquartered in Ohio. Even in *Coady*, where the court took as true, *arguendo*, Cross Country Bank's assertions that it was "a Delaware bank chartered in and organized under the laws of Delaware with its sole place of business in Delaware" (facts more favorable to the bank defendant than in the present case), the Wisconsin Court of Appeals held that Wisconsin, not Delaware, law applied, as the bank "solicited plaintiffs in Wisconsin[3],…supplies a service used in Wisconsin, and the plaintiffs…[were] Wisconsin residents who brought suit in a Wisconsin forum." *Id.* at 739. Thus, Wisconsin's contacts far outweigh any Ohio contacts in this action.

### b.   Even under a "choice-influencing" factors analysis, Wisconsin law applies.

While Plaintiff maintains that Defendants have failed to overcome the initial presumption favoring Wisconsin law applies, Wisconsin law nevertheless applies even based on an analysis of the five "choice influencing" factors.

### i.   Predictability of results favors application of Wisconsin law.

The *Drinkwater* analysis is on point here. Banks and large corporations such as Defendants are "in a relatively good position to calculate the risks associated with decreased predictability" of whether Ohio law will apply. *Drinkwater*, 714 N.W.2d at 577. "In contrast, …[courts] would not expect reasonable Wisconsin consumers to foresee that they should" consider another state's consumer protection statutes, or public policies on class actions, as they relate to credit cards that they apply for, get, use, and pay on in Wisconsin. *Id.* "Thus, although

---

[3]       Defendants solicit Plaintiff's and other Wisconsin consumers' business in Wisconsin by offering, promoting, and selling their retail, or private-label credit cards, at various Wisconsin stores, such as the one where Plaintiff obtained her credit card application.

the application of…[Ohio] law might modestly increase predictability for Defendants, the application of Wisconsin law would facilitate predictability for Wisconsin citizens consumers such as Plaintiff. Defendants, and those similarly situated, are in a better position to calculate the risk of a modest amount of unpredictability and adjust accordingly." *Id.* This factor favors applying Wisconsin law.

**ii.     Maintenance of interstate order favors application of Wisconsin law.**

"This factor requires that a jurisdiction which is minimally concerned defer to a jurisdiction that is substantially concerned." *Id.* This factor strongly favors Ohio deferring to Wisconsin. Wisconsin is substantially concerned, and has significant contacts with this case, which involves a consumer contract that was entered into in Wisconsin. Plaintiff, a Wisconsin resident, signed up for, was approved for, and received the credit card in Wisconsin. Further, Plaintiff used the card in Wisconsin and made payments from her bank account located in Wisconsin. In contrast, the only minimal concern that Ohio used to have is that one of the Defendants was formerly headquartered there. However, not even this contact with Ohio existed at the time of the filing of this lawsuit, as Alliance Data had moved WFNNB's headquarters to Delaware by the end of summer 2010. Under the facts in this matter, Ohio, with its minimal concern, should yield to Wisconsin's far greater concerns in protecting its consumers. *Cf. with Drinkwater*, 714 N.W.2d at 576-77 (outlining the intertwining facts of a case constituting more than minimal concern for more than one state).

**iii.     Simplification of the judicial task favors application of Wisconsin law.**

The analysis of this factor is straightforward. A "judicial task is rarely simplified when lawyers and judges must apply themselves to foreign law." *Drinkwater*, 714 N.W.2d at 578

12

(citing *Beloit Liquidating Trust v. Grade*, 677 N.W.2d 298, 308, 270 Wis. 2d 356 (2004).

*Beloit Liquidating*, 2004 WI 39, 270 Wis. 2d 356, P28, 677 N.W.2d 298; and *Finch v. Southside Lincoln-Mercury, Inc.*, 685 N.W.2d 154, 274 Wis. 2d 719 (Ct. App. 2004) ("application of our own law, as opposed to the law of a foreign jurisdiction, will always simplify our judicial task, except where Wisconsin law is complex or uncertain as compared to that of the other jurisdiction")).  Here, application of Ohio law results in no simplification of the judicial tasks in this Wisconsin case.

### iv.   Advancement of Wisconsin's governmental interests favors application of Wisconsin law.

When it comes to the advancement of Wisconsin's governmental interests, "[t]he question in private litigation, such as …[this], is whether the proposed nonforum rule comports with the standards of fairness and justice that are embodied in the policies of …[Wisconsin's] law."  *Drinkwater*, 714 N.W.2d at 578-79 (quoting *Gillette*, 641 N.W.2d at 678).  In this action, applying Wisconsin's WDTPA law, among the other common law and injunctive claims raised in this case, advances the Wisconsin's interest in protecting its consumers.  *Gillette*, 641 N.W.2d at 678 (citation omitted).

Moreover, given that the WDTPA has a deterrent or preventative element to it (*see Novell*, 749 N.W.2d at 551; *Automatic Merchandisers of Am., Inc.*, 221 N.W.2d at 686; *Tim Torres Enter., Inc.*, 416 N.W.2d at 676), application of this consumer protection law, including the remedies and injunctive relief sought therein, gives even more weight to the application of Wisconsin law.  *See Gillette*, 641 N.W.2d at 678 (under the governmental interests factor analysis court's are to be mindful of the "admonitory and deterrent aspect" of some of Wisconsin's laws).  Wisconsin's interest becomes even more intense when it is protecting its

13

citizens from "take-it-or-leave" agreements, or contracts of adhesion. *Coady*, 729 N.W.2d at 743 (citing and quoting *Wisconsin Auto Title Loans*, 714 N.W.2d at 165-66, 170-71; and Black's Law Dictionary 342 (8th ed. 2004)).

The Court should also examine the relevant contacts of the parties with the respective states. *Id*. at 739. As previously discussed, Wisconsin has the most significant contacts with the parties because Plaintiff is a Wisconsin resident, signed up for and used the Credit Card in Wisconsin, seeks to represent a class of hundreds, if not thousands of other Wisconsin residents that were marketed to directly in Wisconsin, and is seeking protection from Defendants' fraudulent conduct under Wisconsin law. (*See* Complaint, *generally*; Clemins Decl., *generally*.) Due to the large potential number of Wisconsin consumers involved, this factor weighs in favor of applying Wisconsin's consumer protection laws. Wisconsin has a strong interest in preventing the employment of unfair and deceptive business practices against its citizens. *See Tim Torres Enter., Inc.*, 416 N.W.2d at 676.

Finally, the Wisconsin Supreme Court has consistently expressed this state's strong governmental interest in disallowing parties, especially those of vastly superior bargaining power, from writing into contracts—particularly contracts of adhesion—clauses that would insulate or exculpate the drafting party from liability. *See Atkins v. Swimwest Family Fitness Ctr.*, 691 N.W.2d 334, 338-41, 277 Wis. 2d 303 (2005) (collecting cases); *see also Merten v. Nathan*, 321 N.W.2d 173, 178, 108 Wis. 2d 205 (1982) (It is the broad concept of Wisconsin public policy, which "embodies the community common good and common conscience", that forms the "principle of law" limiting contractual freedoms in the manner discussed above and in *Atkins*.). However, as more courts are recognizing, binding arbitration agreements with mandatory class action waiver provisions, such as these Defendants have imposed on Plaintiff

14

and other consumers, are nothing more than just that: veiled efforts to write in exculpatory provisions to their form contracts in an effort to insulate themselves from liability for their wrongdoing. *See, e.g., Feeney v. Dell Inc.*, 908 N.E.2d 753, 765 (Mass. 2009) (permitting corporations "to insulate themselves from small value consumer claims creates the potential for countless customers to be without an effective method to vindicate their statutory rights . . . .")*; Davis v. Global Client Solutions, LLC*, No. 3:10-CV-322-H, 2011 U.S. Dist. LEXIS 5433, at *9 (W.D. Ky. Jan. 20, 2011) (finding that a "clause banning class actions is an 'exculpatory provision which may effectively shield a company from liability for unlawful activity.'") (internal citation omitted); and *Schnuerle v. Insight Commc'ns Co.*, No. 2009-SC-000390-DG, 2010 Ky. LEXIS 288 (Ky. Dec. 16, 2010) (same).

Multiple Wisconsin Court of Appeals decisions have also directly acknowledged this practical reality. In *Cruz v. All Saints Healthcare System, Inc.*, the court held that:

> [G]iven the economic realities of…[a] case, class action may be the only effective means to implement the legislature's intent to provide redress for…[violations of the law]…[When the] individual amounts at issue are small and not likely to justify individual suits[, such]… economic factors make…[a] case ideally suited to class action…[T]he aggregation of small claims, when joined as a class, becomes worthwhile to litigate. This economy of scale rationale underlying class actions has long been recognized by courts…[I]f it were not for a class action suit numerous interested parties would be denied their day in court because an individual claim, though meritorious, would not warrant the time of a lawyer.

25 N.W.2d 344, 348-49, 242 Wis. 2d 432 (Ct. App. 2001) (citations omitted). More significantly, in holding an arbitration agreement unconscionable, and hence unenforceable, under circumstances nearly identical to those in the present case, the *Coady* court reached and approved the same reasoning and conclusion as the above cases, while drawing on an even broader array of other appellate or high state court rulings to support its conclusion. *Coady*, 729 N.W.2d at 746-47 (collecting cases). This "realistic" principal has also been recognized in the

15

Seventh Circuit. *See Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("The *realistic* alternative to a class action is not…[a great number of] individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $ 30.") (emphasis in original).

Applying Ohio law would conflict with fundamental policies of Wisconsin law that preclude waivers of class action procedures that protect consumers. *See Estes*, 784 N.W.2d at 734. The decisions discussed herein confirm that in situations such as the present case, Wisconsin courts view class arbitration bans as patently unfair to potential plaintiffs who may only sue for a relatively small amounts, while serving as exculpatory clauses for the large sophisticated companies protected by these provisions that avoid litigation or responsibility for their wrongful conduct. *Coady*, 729 N.W.2d at 746-47; *Estes*, 784 N.W.2d at 734; *Cruz*, 25 N.W.2d at 348-49. Here, Defendants' arbitration provision contains **exactly** such a class action waiver in a contract of adhesion written by a banking institution with superior bargaining power. This case involves a small amount of damages on a per-person basis, and Plaintiff alleges Defendants were aware that many of the cardholders they marketed and sold the Payment Protection plan to were ineligible for the plan's benefits before they even enrolled, but still charged them considerable monthly fees for the useless service. As claimed in Defendants' motion, Ohio law does not protect its citizens from exculpatory class action waivers to the extent that Wisconsin does. Therefore, an application of Ohio law, rather than Wisconsin's, would conflict with a fundamental policy of Wisconsin, and would greatly impede this state's very strong governmental interest in protecting its citizens from unscrupulous and illegal acts.

16

### v.    Applying the better rule of law favors application of Wisconsin law.

Wisconsin substantive law should apply here, as that "the primary choice of law rule [is that] '… the law of the forum should presumptively apply unless it becomes clear that nonforum contacts are of the greater significance,'" and Wisconsin law meets more of "the five choice-influencing considerations". *Gillette*, 641 N.W.2d at 678-79.  *See also Drinkwater*, 714 N.W.2d at 579-80.  Wisconsin has significantly greater contacts to the matter than Ohio, and the five factors point to the application of Wisconsin law.  *Drinkwater*, 714 N.W.2d at 579-80.

### 2.    WFNNB's arbitration provisions are unconscionable and unenforceable under Wisconsin law.

Under Wisconsin law a contract, or contract provision, is invalid, and hence unenforceable, if it is unconscionable.  *Wisconsin Auto Title Loans*, 714 N.W.2d at 164.  "The concept of unconscionability has deep roots in both law and equity but was developed primarily in equity."  *Id.* (*citing Disc. Fabric House of Racine, Inc. v. Wisconsin Tel. Co.*, 345 N.W.2d 417, 425, 117 Wis. 2d 587 (1984)).  The doctrine of unconscionability has both a procedural and a substantive element.  *Id.* (*citing Disc. Fabric*, 345 N.W.2d at 425).  However, a "court will weigh all the elements of unconscionability and may conclude unconscionability exists because of the combined quantum of procedural and substantive unconscionability."  *Id.*  "The more substantive unconscionability present, the less procedural unconscionability is required, and vice versa."  *Id.*

### a.    Defendants' arbitration provisions are procedurally unconscionable.

"Determining whether procedural unconscionability exists requires examining factors that bear upon the formation of the contract, that is, whether there was a 'real and voluntary

17

meeting of the minds' of the contracting parties." *Wisconsin Auto Title Loans*, 714 N.W.2d at

165 (citations omitted). The Wisconsin Supreme Court has thus held that:

> [t]he factors to be considered include, but are not limited to, age, education,
> intelligence, business acumen and experience, relative bargaining power, who
> drafted the contract, whether the terms were explained to the weaker party,
> whether alterations in the printed terms would have been permitted by the drafting
> party, and whether there were alternative providers of the subject matter of the
> contract."

*Id.* at 165-66 (citations omitted). As detailed below, in the present case there are many factors,

including, but not limited to, most of the enumerated ones from *Wisconsin Auto Title Loan*'s

explicitly non-exhaustive list, that demonstrate the procedural unconscionability of the

arbitration provision and class action waiver at issue, if not the entire contract containing these

clauses.

First, Defendants' failure to provide Plaintiff with the arbitration terms prior to her

enrollment in the Credit Card Agreement and Payment Protection plan demonstrates procedural

unconscionability. *Coady*, 729 N.W.2d at 743. In fact, the Credit Card terms and conditions

actually arrive in the mail after service starts in a "bill stuffer."[4] Additionally, the arbitration

agreement is a classic contract of adhesion—"a take-it-or-leave-it" form contract of Defendants'

where Plaintiff had no ability to bargain or negotiate. *Coady*, 729 N.W.2d at 743 (citing and

quoting *Wisconsin Auto Title Loans*, 714 N.W.2d at 165-66, 170-71; and Black's Law Dictionary

---

[4]      Courts routinely deem arbitration agreements provided in "bill stuffers" unenforceable. *See*, *e.g*., *Skirchak v. Dynamics Research Corp.*, 508 F.3d 49 (1st Cir. 2007); *Discover Bank v. Super. Ct*., 113 P.3d 1100, 1108 (Cal. 2005) ("[W]hen a consumer is given an amendment to its cardholder agreement in the form of a 'bill stuffer' that he would be deemed to accept if he did not close his account, an element of procedural unconscionability is present"); *FIA Card Servs., N.A., v. Cohen*, NO. A-3026-07T2, 2009 N.J. Super. LEXIS 1565, at *1 (N.J. Super. A.D. June 17, 2009) (holding that imposition of an arbitration agreement through a "bill stuffer" presented a factual question precluding summary judgment for the defendant).

18

342 (8th ed. 2004)).  Such a "suspect" form of contract also weighs in favor of a finding of procedural unconscionability.  *Id.*

These two factors alone show the procedural unconscionability of the arbitration provision and class action waiver.  However, there are yet many other facts here that weigh heavily in favor of procedural unconscionability under Wisconsin law,[5] including: (1) there is no evidence that Plaintiff has any particular business acumen or experience, especially when compared to Defendants;[6] (2) Plaintiff is, and has been at all relevant times, unemployed and receiving disability; (3) the relative bargaining power between the Plaintiff and Defendants was grossly disproportionate (there are hundreds, if not thousands of WFNNB credit card customers in Wisconsin, and Defendants are multimillion dollar national companies and banks); (4) the form nature of the Credit Card Agreement makes it clear that Defendants drafted it, including the arbitration clause, without so much as even any input from Plaintiff; (5) Defendants did not review or explain any of the terms of the Credit Card Agreement with Plaintiff, including the arbitration provision;[7] (6) the Credit Card Agreement, including the arbitration clause, was a

---

[5]    Except as where additionally noted, *see Coady*, 729 N.W.2d at 742-43 (court conducted an assessment of procedural unconscionability under Wisconsin Supreme Court's factors as stated in *Wisconsin Auto Title Loans*).

[6]    *See Siemer v. The Quizno's Franchise Co., LLC*, No. 07 C 2170, 2008 U.S. Dist. LEXIS 25907, at *19 n.2 (N.D. Ill. March 31, 2008) (noting the Seventh Circuit's differentiation in unconscionability analysis between two sophisticated, commercial entities negotiating a contract, and agreements where one of the parties is a "vulnerable consumer") (citing *We Care Hair Dev., Inc. v. Engen,* 180 F.3d 838, 843 (7th Cir. 1999)).  *See also Cost Cutters Leasing, LLC v. KLMP, LLC*, 746 N.W.2d 605, 308 Wis. 2d 396 (Wis. Ct. App. 2008) (in failing to find sufficient procedural unconscionability the court stressed that the agreement at issue "was the product of a year's negotiations between two business entities," and that the result that it was reaching "is a straightforward counterpoint to cases such as *Wisconsin Auto Title Loans* and *Coady*"); and *The Dry Dock, LLC, v. The Godfrey Conveyor Co.*, 717 F. Supp. 2d 825, 834 (W.D. Wis. 2010) ("Unconscionability rarely exists in a commercial setting involving parties of equal bargaining power…because there is little need for the court to protect the interests of savvy commercial parties in dealings with each other.") (citation omitted).

[7]    Under Wisconsin law one factor relevant to procedural unconscionability is whether the terms of a contract were explained to the weaker party.  *See Wisconsin Auto Title Loans, Inc*., 714 N.W.2d at 166.

19

multi-page document in small print;[8] (7) Plaintiff was not aware of the arbitration clause in the Credit Card Agreement;[9] and (8) Plaintiff's credit card account, like those of other Wisconsin consumers, was opened in response to solicitations from Defendants' retail store partners, for whom Defendants issue their private label cards.[10]

Further, all of the foregoing factors easily establish that Plaintiff lacked any "'meaningful choice,' as that phrase is used in the law of unconscionability." *See Coady*, 729 N.W.2d at 743-44 (*citing Wisconsin Auto Title Loans* extensively, as well as other relevant authority) ("Parties asserting unconscionability are not necessarily required to demonstrate to a factual certainty that they could not have obtained the desired product or service elsewhere under more favorable terms."). Accordingly, based on all of the circumstances, a sufficient, and in fact substantial, "quantum" of procedural unconscionability is present here.

### b. Defendants' arbitration provisions are substantively unconscionable.

Defendants' arbitration and class action waiver provisions are also substantively unconscionable. They are one-sided—Defendants lose nothing by waiving their right to a class action, a right they would never exercise against consumers. *See Kinkel v. Cingular Wireless, LLC*, 857 N.E.2d 250, 267 (Ill. 2006) ("although both parties ostensibly waived the ability to pursue a class action, the limitation applies, in practice, only to prevent customers 'from seeking redress for relatively small amounts of money") (citations omitted); *AutoNation*, *USA Corp. v.*

---

[8]   *See Leasefirst v. Hartford Rexall Drugs, Inc.*, 483 N.W.2d 585, 588, 168 Wis. 2d 83 (Ct. App. 1992).
[9]   *See Leasefirst*, 483 N.W.2d at 588. Nor could Plaintiff have done this prior to her purportedly becoming bound by the agreement and its non-waivable arbitration provision, as she was enrolled in the card prior to any subsequent receipt of an agreement. *See Coady*, 729 N.W.2d at 743.
[10]  *See First Federal Fin. Serv., Inc. v. Derrington's Chevron, Inc.*, 602 N.W.2d 144, 148, 230 Wis. 2d 553 (Ct. App. 1999).

*Leroy*, 105 S.W.3d 190, 198 (Tex. App. 2003) ("The basic test for unconscionability is whether… the clause involved is so one-sided that it is unconscionable under the circumstances existing when the parties made the contract"); *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1176 (9th Cir. 2003) (noting the obvious fact that "Circuit City would never bring a class proceeding against an employee.").  Yet, if enforced, the waiver would deny consumers an important mechanism for vindicating claims of minor pecuniary value.  *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 161 (1974); *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 338 (1980); *Coady*, 729 N.W.2d at 746-47; *Estes*, 784 N.W.2d at 734; *Cruz*, 25 N.W.2d at 348-49.  As the Seventh Circuit has noted, "[t]he *realistic* alternative to a class action is not many individual suits, but zero individual suits."[11]  *Carnegie*, 376 F.3d at 661 (emphasis in original);

---

[11]    The Seventh Circuit cases and few unreported District Court opinions from Wisconsin cited by Defendants are readily distinguishable from the present case.  More significantly, Defendants cite absolutely no Wisconsin case law authority, Supreme Court, Appellate Court, or otherwise, in support of their Motion.  By and large, the cases cited by Defendants' brief from this Circuit or District deal with arbitration agreements between two large, sophisticated commercial entities, apply another state's law on unconscionability (including pre-*Kinkel* Illinois law in many instances), and/or pre-date by several years the development of Wisconsin law on this matter in the holdings of *Wisconsin Auto Title Loans, Coady,* and *Estes*.  *See James v. McDonald's Corp.*, 417 F.3d 672 (7th Cir. 2005) (applying pre-*Kinkel* Illinois law, with no issue of class action waiver); *Hill v. Gateway 2000, Inc.,* 105 F.3d 1147 (7th Cir. 1997) (Seventh Circuit interpretation of Illinois law that is now unequivocally contrary to Illinois Supreme Court authority in *Kinkel* and *Razor v. Hyundai Motor Am.,* 854 N.E.2d 607 (Ill. 2006), and hence no longer good law on this point (*see Trujillo v. Apple Computer, Inc.*, 578 F. Supp. 2d 979, 993-94 (N.D. Ill. 2008)); *Jain v. De Mere*, 51 F.3d 686, 688 (7th Cir. 1995) (concerned only the issue of "whether federal courts have power to compel arbitration between two foreign nationals where their arbitration agreement fails to specify a location for the arbitration or a method of choosing arbitrators"); *United Steel, Paper & Forestry & Serv. Workers Int'l Union v. Trimas Corp.*, 531 F.3d 531 (7th Cir. 2008) (no issue of unconscionability; further, contract was heavily negotiated between two large, sophisticated commercial entitities); *United Steel, Paper & Forestry v. Briggs & Stratton Corp.*, No. 07-C-824, 2008 U.S. Dist. LEXIS 93727 (E.D. Wis. Nov. 3, 2008) (same); *Karl Schmidt Unisia, Inc. v. Int'l Union, United Auto., et al.*, 628 F.3d 909 (7th Cir. 2010) (same); *Slinger Mfg. Co. Inc. v. Nemak, S.A., et al.*, No. 08-C-656, 2008 U.S. Dist. LEXIS 91330 (E.D. Wis. Sep. 24, 2008) (same) *Lombardi Ave. Waterpark, LLC v. D&C Hospitality Invs., LLC*, No. 08-C-32, 2008 U.S. Dist. LEXIS 17493 (E.D. Wis. Feb. 22, 2008) (same); *We Care Hair Dev., Inc. v. Engen,* 180 F.3d 838, 843 (7th Cir. 1999) (applying Illinois state law well before *Kinkel* to agreement between sophisticated commercial entities, **and explicitly distinguishing these strictly commercial cases from those involving compelling arbitration in individual consumer case**); *Janiga v. Questar Capital Corp.*, 615 F.3d 735 (7th Cir. 2010) (challenged

21

*see also Ting*, 319 F.3d at 1150 n.14 (even where "neither side technically had recourse to the courts," where there is "no chance that a large company would file a class action against its customers," the class action waiver is rendered "unduly one-sided' and unconscionable).

Additional evidence of substantive unconscionability is that the class action waiver effectively operates as an exculpatory clause due to the small individual damages at issue. As the Wisconsin Court of Appeals has noted:

> [T]he availability of class-wide relief is often the only means of vindicating consumer rights. This is particularly so when the damages involved are comparatively small for each individual consumer. Moreover, without the availability of a class-wide mechanism, many consumers may never realize that they have been wronged because they may not know that the defendant's conduct is illegal. In addition, the prospect of class-wide relief 'ordinarily has some deterrent effect on a manufacturer or service provider,' but any such effect is eviscerated by arbitration clauses like [Defendants'].

*Coady*, 729 N.W.2d at 747 (citations omitted). *See also Estes*, 784 N.W.2d at 734; *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997) ("…small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's labor.").

---

provision involved no issue of class action waiver, and Wisconsin law was not at issue); *Livingston v. Assocs. Fin., Inc.*, 339 F.3d 553 (7th Cir. 2003) (pre-*Kinkel* case involving Illinois law that made *no* mention of the term unconscionable, or Illinois law or any state's substantive law, let alone discuss these things, in its brief discussion of a motion to compel arbitration—case was distinguished by *Kinkel* court); *Dienese v. McKenzie Check Advance of Wis.,LLC*, No. 99-C-50, 2000 U.S. Dist. LEXIS 20389 (E.D. Wis. Dec. 11, 2000) (on motion for class certification court held that persons that affirmatively signed an arbitration agreement and class action waiver that explicitly notified them of the then already pending litigation could not subsequently be class members in the class certified by the court); *Battle v. Nissan Motor Acceptance Corp.*, No. 05-C-0669, 2006 U.S. Dist. LEXIS 37916 (E.D. Wis. March 9, 2006) (decided on Wisconsin law before the substantive holdings in *Wisconsin Auto Title Loans*, *Coady*, and *Estes*, and explicitly distinguished from cases such as these by the Wisconsin Supreme Court in *Wisconsin Auto Title Loans* (*see* 714 N.W.2d at 165 n.23)).

The Supreme Court has recognized that financial implications of arbitration may "preclude a litigant…from effectively vindicating her federal statutory rights in the arbitral forum." *Green Tree Fin. Corp. – Alabama v. Randolph*, 531 U.S. 79, 90 (2000). In accessing the high costs of bringing an individual claim in arbitration, the court should consider not only filing fees, but also all the reasonable related costs that the plaintiff is likely to incur. *Id.* Courts recognize that plaintiffs are not likely to pursue individual litigation or arbitration where the cost of expert fees and attorneys' fees would far exceed the potential recovery. *Kristian v. Comcast,* 446 F.3d 25, 54-55 (1st Cir. 2006) ("[t]he class mechanism ban—particularly its implicit ban on spreading across multiple plaintiffs the costs of experts, depositions, neutrals' fees, and other disbursements—forces the putative class member to assume financial burdens so prohibitive as to deter" claims). In fact, given the modest size of her claims, Plaintiff would be hard-pressed to find counsel to represent her in individual litigation or arbitration. *See, e.g.*, *Coneff v. AT&T Corp.*, 620 F. Supp. 2d 1248, 1257-58 (W.D. Wash. 2009).

The Supreme Court has also recognized that the class action mechanism is essential to the vindication of litigants' rights "to overcome the problem that small recoveries do not provide the incentive for any individual to bring solo action prosecuting his or her rights." *Amchem.*, 521 U.S. at 617 (quotation omitted). *See also In re Charter Co.*, 876 F.2d 866, 871 (11th Cir. 1989) ("[T]he effort and cost of investigating and initiating a claim may be greater than many claimants' individual stake in the outcome, discouraging the prosecution of these claims absent a class action filing procedure."). The bar on class-wide arbitration, combined with the excessive costs and financial risks of arbitrating an individual claim, prevent Plaintiff from pursuing her claims.

23

Plaintiff's individual claim for damages is relatively small, and, absent a right to bring this action on a class-wide basis, few if any cardholders that enrolled in the Payment Protection plan would undertake the effort to bring a claim despite the consistent and widespread illegal and unfair practices of the Defendants. Moreover, claims of deceptive business practices are by their nature difficult for individual consumers to discover and successfully prosecute. *See Coady*, 729 N.W.2d at 747 ("[W]ithout the availability of a class-wide mechanism, many consumers may never realize that they have been wronged because they may not know that the defendant's conduct is illegal."); *see also Kinkel*, 857 N.E.2d at 267-68 (the nature of an underlying claim is also relevant to the determination of unconscionability because some claims "are not likely to be recognized [by typical consumers] let alone successfully argued in court or arbitration, without the aid of an attorney").

Even assuming Plaintiff could find a suitable attorney willing to represent her in an individual arbitration proceeding, the costs associated with the retention of experts alone would act as another barrier to prevent Plaintiff from pursuing her claims. Plaintiff's action most likely requires an expert to assess the defective service, the widespread impact of the alleged deceptive marketing and sales of the service, and the financial value of the alleged deception on cardholders. By precluding class proceedings, Defendants effectively deny their customers the ability to pool their resources with other damaged cardholders and share the onus and costs associated with proving the same claims against the Defendants.

While WFNNB deceptively drafted its arbitration provisions to appear to be somewhat "consumer friendly," they are anything but that. The mandatory arbitration provisions in the Credit Card Agreement provide "[a]t your written request, we will advance any arbitration filing, administrative and hearing fees which you would be required to pay to pursue a claim or dispute

24

as a result of our electing to arbitrate that claim or dispute." However, "[t]he arbitrator will decide who will ultimately be responsible for paying those fees." Moreover, Plaintiff, or any other Wisconsin consumer, still bears the expenses necessary for attorneys, experts and witnesses. This is a critical barrier to entry. *See In re Am. Express Merch. Litig*., 554 F.3d 300, 316 (2d Cir. 2009). Similarly, for all of the reasons discussed above concerning the economic realities and difficulty in identifying wrongdoing, Defendants' assertion in their Credit Card Agreement that they "will not invoke…[their] right to arbitrate an individual claim you bring in small claims court" does not save their arbitration agreement, and is not significant. *Coady*, 729 N.W.2d at 747 n.15 (The fact that "an arbitration clause provides that…plaintiffs are free to bring a small claims action…is [not] significant", because a contrary holding would be based on the faulty assumption "that attorneys are willing to take small claims cases for plaintiffs on an individual basis or that plaintiffs are able to effectively represent themselves in small claims court against multimillion dollar national corporations such as" defendant.).[12]

There can be no question that the arbitration provisions and class waivers here should be invalidated. Plaintiff neither negotiated these provisions nor assented to their binding effect on her rights. These provisions instead were imposed on a take-it-or-leave-it basis, in a pre-printed contract of adhesion. The class waiver is harshly one-sided. Defendants do not and cannot offer

---

[12] In addition to the holding in *Coady*, the full language of Defendants' small claims exception shows that even by its own terms any consumer friendly aspect of this provision is illusory. This clause has a caveat that Defendants will not invoke their right to arbitrate "so long as the claim is pending only in that court [i.e., the small claims court] and does not exceed $5,000." Wisconsin, like other states, allows the losing party at small claims court to appeal that decision *de novo* to the state's trial level court. Thus, even if an individual consumer is able to prevail against Defendants in small claims court, Defendants are free to appeal that decision, and nevertheless invoke arbitration, as the claim would no longer be pending in "that court." Additionally, even at the outset of a consumer initiating a smalls actioniuh, per Defendants' arbitration provision, all Defendants have to do is assert "any new claim" in response (even a *de minimus* or sham counterclaim), and they then may elect to arbitrate instead.

25

any legitimate business justification for requiring their customers to waive their rights to participate in a class action. Defendants would never file a class action against their customers, yet class actions, as a practical matter, constitute the only mechanism for deterring and redressing the wrongdoing on the part of the Defendants. The arbitration provisions at issue here are procedurally and substantively unconscionable and thus should not be enforced. Since there is no basis for imposing arbitration, the Court should allow the proceedings to continue and deny a request for a stay.

### 3. WFNNB's arbitration provisions are also unconscionable and unenforceable under Ohio law.

Even though Wisconsin law should apply to the analysis of whether the arbitration and class action waiver provisions are unconscionable, the provisions would also be unconscionable under Ohio law. Ohio law recognizes that a contract, including an arbitration agreement, may be unenforceable due to generally applicable contract defenses such as unconscionability. "Unconscionability is determined by reference to the relative benefit of the bargain to the parties at the times of its making, the nature of the methods employed in negotiating it, and the relative bargaining power of the parties." *Miller v. Household Realty Corp.*, No. 81968, 2003 Ohio App. LEXIS 3061, at *19 (Ohio Ct. App. June 26, 2003).

Procedural unconscionability is evident when there was no voluntary meeting of the minds during the execution of the arbitration agreement, and substantive unconscionability is evident when the results of the agreement are unfair and unreasonable. *Miller*, 2003 Ohio App. LEXIS 3061, at *20-21 (citing *Collins v. Click Camera & Video, Inc.*, 621 N.E.2d 1294, 1299, (Ohio Ct. App. 1993)); *see also Stout v. J.D. Byrider*, 228 F.3d 709, 715-16 (6th Cir. 2000). The presumption favoring arbitration is weaker in a case where there are strong indications that the

26

arbitration clause is adhesive in nature. *Williams v. Aetna Fin. Co.*, 700 N.E.2d 859, (Ohio 1998). Also, arbitration agreements should be examined more closely in dealings between consumers and sophisticated lending institutions. *Miller*, 2003 Ohio App. LEXIS 3061, at *20.

As set forth above, Defendants' arbitration provisions are procedurally unconscionable because they were not presented to Plaintiff prior to or during her enrollment in the Credit Card Agreement and the Payment Protection plan, and therefore she had no meaningful opportunity to review or negotiate the terms. Thus, the agreement is a classic take-it-or-leave-it contract of adhesion, drafted by a sophisticated banking institution that clearly has superior bargaining power. As further set forth above, the arbitration provision is unfair and unreasonable, and substantively unconscionable, since it effectively prevents Plaintiff and other consumers from vindicating their rights and challenging Defendants' wrongful conduct.

        4.       **Courts nationwide increasingly find that class action waivers are void.**

Federal appellate courts outside the Seventh Circuit hold that provisions like these should not be enforced in consumer fraud cases where there are a large number of class members but individual damages are too small to justify individual actions. In *In re Am. Express Merch. Litig.*, No. 06-1871-cv, 2011 U.S. App. LEXIS 4507 (2d Cir. Mar. 8, 2011), the Second Circuit recently held that a class action waiver in an American Express Card Acceptance Agreement was unenforceable because it "precludes plaintiffs from enforcing their statutory rights," where "the size of any potential recovery by an individual plaintiff will be too small to justify the expense of bringing an individual action." *Id.* at *32. Then, less than three weeks later, and two days before Defendants filed their motion to compel arbitration in this action, the Eleventh Circuit held in *Gordon v. Branch Banking and Trust*, No. 09-15399, 2011 U.S. App. LEXIS 6275 (11th Cir. March 28, 2011) that a class action waiver that prevented consumer checking account holders

27

from obtaining needed representation to challenge practices by their bank that are unlawful is unconscionable and unenforceable. *Id.* at *17.

In *Homa v. American Express Co.*, 558 F.3d 225 (3d Cir. 2009), the Third Circuit invalidated an arbitration clause with an embedded class action waiver that was "presented on a take-it-or-leave-it basis, in a standardized printed form, and without opportunity for the 'adhering' party to negotiate except perhaps on a few particulars," where the plaintiff's claim "predictably involve[d] a small amount of damages." 558 F.3d at 231 (citations, internal quotation marks, and alterations omitted). Similarly, in *Kristian*, the First Circuit refused to enforce a class action waiver provision imposed on a take-it-or-leave-it basis. 446 F.3d at 61 n.23 ("If the class mechanism prohibition here is enforced, Comcast will be essentially shielded from private consumer antitrust enforcement liability, even in cases where it has violated the law."). Other Circuits have deemed such provisions void based on the same considerations. *See also Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.*, 622 F.3d 996, 1004 (9th Cir. 2010) ("[C]lass action waivers are usually considered substantively unconscionable . . . .").

Federal district courts have also recognized the growing consensus that class action waivers (especially when inserted in mandatory arbitration provisions) violate public policy by cutting off the possibility of effective consumer redress and reducing deterrence of corporate misconduct. For example, in *In re Checking Account Overdraft Litig.*, 734 F. Supp. 2d 1279, (S.D. Fla. 2010), a Florida district court declared unconscionable bank-imposed arbitration provisions containing class action waivers under the laws of North Carolina, South Carolina, Georgia, and Maryland. *Id*. at 1293 ("In sum, these arbitration provisions will have the practical

28

effect of precluding consumers from bringing an action against the banks.").[13] The

overwhelming weight of recent state court authority is in accord.[14]

### C. If Arbitration Is Ordered, This Court Should Bifurcate And Grant Plaintiff's Claims For Injunctive Relief.

Even if the Court is inclined to order arbitration, it should order class-wide arbitration.

Further, if the Court is inclined to order any form of arbitration, all of the proceedings should not

be stayed. The Court should bifurcate the matter and hear Plaintiff's claims requesting

injunctive relief under the WDTPA to remedy Defendants' fraudulent and deceptive practices

that continue to harm Wisconsin consumers. Injunctive relief under the WDTPA furthers the

---

[13]    *See also Davis*, 2011 U.S. Dist. LEXIS 5433, at *9 (finding that a "clause banning class actions is an 'exculpatory provision which may effectively shield a company from liability for unlawful activity.'") (internal citation omitted); *Coneff v. AT & T Corp.*, 620 F. Supp. 2d 1248, 1256-60 (W.D. Wash. 2009) (recognizing that "recent jurisprudence views class-action waivers unfavorably" and declining to enforce such a provision, "consistent with the modern trend."); *Lopez v. Am. Express Bank, FSB*, No. CV-09-07335-SJO, 2010 U.S. Dist. LEXIS 76356, at *18-29 (C.D. Cal. June 2, 2010); *Skirchak v. Dynamics Research Corp.*, 432 F. Supp. 2d 175, 180-81 (D. Mass. 2006); *Cooper v. QC Fin. Servs., Inc.*, 503 F. Supp. 2d 1266, 1288-90 (D. Ariz. 2007); *In re Apple & AT & TM Antitrust Litig.*, 596 F. Supp. 2d 1288, 1298-1300 (N.D. Cal. 2008); *Jones v. DirecTV, Inc.*, 667 F. Supp. 2d 1379, 1381-82 (N.D. Ga. 2009); *Hopkins v. New Day Fin.*, 643 F. Supp. 2d 704, 718 (E.D. Pa. 2009).

[14]    *See Picardi v. United Hyundai*, No 53126, 2011 Nev. LEXIS 11, at *13-15 (Nev. March 31, 2011) (class action waiver unenforceable because it violates state's public policy favoring class actions by prohibiting class status in both litigation and arbitration.); *Felts v. CLK Management, Inc.*, Nos. 30,142 & 29,702, 2011 N.M. App. LEXIS 7 (N.M. App. March 2, 2011); *Schnuerle*, 2010 Ky. LEXIS 288 (class action ban is exculpatory provision and unenforceable); *Ruhl v. Lee's Summit Honda*, 322 S.W.3d 136, 140 (Mo. 2010) ("To enforce the class action waiver in a situation of unequal bargaining power, on a preprinted form, unfairly would deprive consumers of the only practical means of retaining counsel to navigate the complexities of consumer law effectively."); *Herron v. Century BMW*, 693 S.E.2d 394, 399 (S.C. 2010); *Feeney*, 908 N.E.2d at 765 (permitting corporations "to insulate themselves from small value consumer claims creates the potential for countless customers to be without an effective method to vindicate their statutory rights . . . ."); *Kortum-Managhan v. Herbergers NBGL*, 204 P.3d 693, 701 (Mont. 2009); *Tillman v. Commercial Credit Loans, Inc.*, 655 S.E.2d 362, 373 (N.C. 2008); *Vasquez-Lopez v. Beneficial Oregon, Inc.*, 152 P.3d 940, 953 (Or. 2007); *Discover Bank*, 113 P.3d at 1108-09; *Eagle v. Fred Martin Motor Co.*, 809 N.E.2d 1161, 1180 (Ohio 2004); *Leonard v. Terminix Intern. Co.*, 854 So. 2d 529, 538 (Ala. 2002); *State ex rel. Dunlap v. Berger*, 567 S.E.2d 265, 278 (W. Va. 2002); *Cordova v. World Fin. Corp. of NM*, 208 P.3d 901, 907-09 (N.M. 2009); *Fiser v. Dell Computer Corp.*, 188 P.3d 1215, 1221 (N.M. 2008); *D.R. Horton, Inc. v. Green*, 96 P.3d 1159, 1162-66 (Nev. 2004); *McKee v. AT & T Corp.*, 191 P.3d 845, 857-58 (Wash. 2008); *Muhammad v. County Bank of Rehoboth Beach*, 912 A.2d 88, 101 (N.J. 2006).

29

statutes "general purpose of…*prevent*[*ing*] certain activities deemed harmful to *citizens'*

economic and social well-being…[and t]he broad remedial scope of sec. 100.18 and *its*

*protective purpose* make it similar to the remedial provisions of the federal antitrust laws." *Tim*

*Torres Enter.*, 416 N.W.2d at 676 (emphasis added). Such relief on behalf of the general public,

or at least the citizens of Wisconsin, is not subject to arbitration. *See Broughton v. Cigna Health*

*Plans of California*, 988 P.2d 67, 78 (Cal. 1999) (*citing Mitsubishi Motors v. Soler Chrysler-*

*Plymouth* 473 U.S. 614, 635-36 (1985)).

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendants

Alliance Data and WFNNB's Motion to Compel Arbitration and Stay All Proceedings in its

entirety. In the alternative, Plaintiff requests the court bifurcate the matter to hear Plaintiff's

WDTPA claims for injunctive relief and order class-wide arbitration on damages.

30

Respectfully submitted,

Dated:  April 22, 2011

**ADEMI & O'REILLY, LLP**

/S/ COREY MATHER
Guri Ademi (SBN: 1021729)
Shpetim Ademi (SBN: 1026973)
David J. Syrios (SBN: 1045779)
Corey Mather (SBN: 1046210)
3620 E. Layton Avenue
Cudahy, WI  53110
Telephone: (414) 482-8000
Facsimile: (414) 482-8001
gademi@ademilaw.com
sademi@ademilaw.com
dsyrios@ademilaw.com
cmather@ademilaw.com

Ruben Honik
Richard M. Golomb
Kenneth J. Grunfeld
**GOLOMB & HONIK, P.C.**
1515 Market Street, Suite 1100
Philadelphia, PA 19102
Telephone: (215) 985-9177

*Counsel for Plaintiff and Proposed Class*

31